UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

FILED

98 NOV 10 PM 2: 52

U.S. DISTRICT COURT
N.D. OF ALABAMA

GARY MASON,                              )
                                         )
            Plaintiff,                   )
                                         )       CIVIL ACTION NO.
-vs.-                                    )       CV-96-P-0123-S
                                         )
GTE CORPORATION and                      )
GTE MOBILNET SERVICE                     )
CORPORATION,                             )               ENTERED
                                         )
            Defendants.                  )       NOV 1 0 1998

## MEMORANDUM OPINION

Before the court is the defendant's Motion for Summary Judgment in this race discrimination case, filed on July 31, 1997. The motion was taken under submission on January 9, 1998. After careful consideration of the briefs and evidentiary materials submitted, the court finds that the defendant's motion is due to be GRANTED as to the plaintiff's discharge and retaliation claims. However, the defendant's motion is due to be DENIED as to the plaintiff's failure to promote claim.

### Facts

GTE Mobilnet[1] is the mobile-cellular and wireless division of GTE Corporation, a telecommunications company with approximately 117,000 employees. GTE Mobilnet provides

---

[1]Cellular One changed its name to GTE Mobilnet on January 1, 1996. As stated in the defendant's Brief in Support of Motion for Summary Judgment, "GTE Corporation is the ultimate parent of GTE Mobilnet of Birmingham, but at no time did GTE Corporation have employment responsibilities for the Birmingham market."

37

network sales/services and installs/repairs mobile telephone equipment. One of GTE Mobilnet's many sales offices is located in Birmingham, Alabama.

Gary Mason began working for GTE Mobilnet in Birmingham in July of 1992. From his date of hire until January of 1994, Mason was a sales representative whose territory was the "Birmingham Area." As a sales representative, Mason solicited cellular telephone accounts and processed the sales agreements. During Mason's early employment with GTE Mobilnet, there was no distinction in the company between commercial and residential sales channels. Sales representatives were expected to solicit both types of accounts. However, in late 1993/early 1994, GTE Mobilnet divided its sales division into three "channels": (1) the commercial channel, (2) the residential channel, and (3) the retail channel. The residential channel was a new market for cellular telephones that catered to individual residential customers exclusively.

When Mason learned of a job opportunity as Residential Sales Manager within the newly established residential channel, he applied for the position by following GTE's formal application and selection procedures. GTE's standard practice for filling a position in Birmingham was a multi-step process coordinated by the Human Resources ("HR") department. First, a job requisition is sent by an upper-level employee to the HR department for approval to advertise for the position. Second, once approved, the job opening is posted on a bulletin board and on the company's internal computer system under the heading "Careers." The job announcements generally remain posted for five business days, during which time interested candidates send the HR department a resume or other indications of interest in the position. Interested applicants are also required to submit a variety of other documents in order to complete their application file. Next, the HR department reviews the

2

completed applications and creates a "slate" of interested candidates.[2] That slate is thereafter sent to the hiring manager along with the applicant's file. Finally, the hiring manager selects those candidates on the slate that he or she believes should be interviewed and makes a decision as to who to hire after conducting the interviews. The hiring manager's candidate selection is subject to approval of the HR department. If approved, the candidate is offered the job.

Although Mason was interviewed for the position of Residential Sales Manager, he was not hired.[3] Instead, in November of 1993, he was offered the new position of Residential Sales Supervisor along with Randy Tingle, a white male. In early 1994, Jim Mullery, general manager of the Birmingham area, recognized that the residential sales channel in Birmingham was not performing well. Mullery discussed the problems with Mason and Tingle, including the fact that there were high cancellation rates and other related problems. Throughout this time, Mason maintained his interest in obtaining other promotions within the company. He applied for positions outside the Birmingham market but was not interviewed nor hired for any of these positions.[4]

In August of 1994, HR Adminstrator Velda Krancer met with Mason during an investigation into sexual harassment charges against Alvin Adams. During the interview with Mason, Krancer asked if there were other concerns dealing with personnel matters other than the pending investigation

_____

[2]In accordance with their practice of promoting from within, GTE first considered employee applicants (internal candidates) for job openings. Apparently, the names of all internal candidates were supposed to be listed on the slate regardless of their qualifications for the position.

[3]Alvin Adams, a white male, was selected for the residential sales manager position.

[4]Mason's supervisor, Alvin Adams, was required to sign off on all requests to apply for promotions before any applications could be submitted. The plaintiff asserts that this evidences the defendant's knowledge of Mason's interest in being promoted.

3

for sexual harassment. Mason asserts that he responded by stating that both he and some of his sales staff had concerns about why there were so few blacks in management and whether there was really any way for blacks to become managers. Allegedly, Krancer responded that she knew there was "a problem" and that GTE was "working on it."[5]

Shortly after the discussion between Mason and Krancer, Adams was terminated, leaving open a position as Residential Sales Manager. Mason informed Jim Moreland, a general manager in Atlanta, that he was interested in being promoted to Adams's former position. Moreland told the plaintiff, however, that Jim Mullery, the general manager for the Birmingham market, would be hiring for the vacancy. Mason testified that he planned to tell Mullery of his interest in the position, he testified that he changed his mind at the last minute because he felt that Mullery would not give him fair consideration for the job.[6]

The position of Residential Sales Manager was posted on the company's job posting system but no applications were received. After getting no response about the position, Mullery talked with two individuals about their interest in the job: Rick Somers, a white male, and Vanessa Phillips, a black female. Somers thereafter applied for the job but Phillips declined because she desired to remain in her current position. Somers was chosen to replace Adams as Residential Sales Manager. Somers had been with the company since 1991 and had been a Retail Sales Supervisor since 1993.[7]

---

[5]Krancer testified that she cannot recall ever making such a statement to Mason. However, she does not deny that it is possible.

[6] Mason based this view on his past experiences with Mullery in which he believed Mullery was "uncomfortable" around blacks and exhibited a pattern and practice of discriminating against black employees.

[7] Somers was one of the top rated supervisors in the company for the retail channel.

4

Within a couple of months of Somers getting the job as Residential Sales Manager, Mason was told that the position of Residential Sales Supervisor was being eliminated and that he and Tingle had the options of: (1) accepting a position as a Retail Sales Associate, (2) accepting a position as a Residential Sales Representative, or (3) electing a severance package. A fourth option was later added that allowed Mason and Tingle to accept a position as Commercial Sales Executive. Mullery also encouraged Mason and Tingle to look on the job posting system for other opportunities within the company. Tingle accepted a position as a Commercial Sales Executive. Mason chose not to apply for any of the listed positions. Instead, he asked Mullery about the Commercial Sales Manager job that had recently opened up. Mullery stated that he was not going to hire anyone for the position at that time. However, the position was still posted on the electronic posting system. Mason apparently wrote a letter to Mullery and Krancer, among others, in February of 1995, to reiterate his interest in the Commercial Sales Manager position. Mason never formally applied for the position. Kay Lucas, a candidate who apparently did formally apply, was hired as Commercial Sales Manager. In March of 1995, Mason rejected the options offered by the defendants and ended his employment with GTE Mobilnet.

Mason filed a charge of discrimination with the EEOC in February of 1995. He thereafter filed his complaint in January of 1996, alleging race discrimination under Title VII and § 1981 for (1) failure to promote him to the management positions of Residential Sales Manager and/or Commercial Sales Manager; (2) discharge, and (3) retaliation.[8]

---

[8]The plaintiff admits that his claim for the 1993 failure to promote him to residential sales manager is time-barred. He asserts, however, that evidence of discriminatory acts, even if time-barred, is probative of discrimination. See Allen v. County of Montgomery, 788 F.2d 1485, 1488 (11th Cir. 1986).

5

<u>Analysis</u>

I. Discharge

Evidence of intentional discrimination can be shown in two ways. First, a plaintiff can present direct evidence of discrimination, such as a decisionmaker's discriminatory remarks made in the context of an employment decision. However, "only the most blatant remarks, whose intent could be nothing other than to discriminate. . .constitute direct evidence of discrimination." <u>Carter v. City of Miami</u>, 870 F.2d 578, 582 (11th Cir. 1989). Second, a plaintiff can present circumstantial evidence to prove a prima facie case of discrimination by showing: (1) that he is a member of a protected class, (2) that he was qualified for the position held, (3) that he was terminated, and (4) that he was replaced by a person outside the protected class. <u>See</u> <u>Conner v. Fort Gordon Bus. Co.</u>, 761 F.2d 1495, 1498 and n.3 (11th Cir. 1985). In a case involving a reduction in workforce, the prima facie case is modified somewhat, requiring a plaintiff to show: (1) that he is a member of a protected class and was adversely affected by an employment decision, (2) that he was qualified for another position at the time of termination, and (4) that there is evidence by which a fact finder could reasonably find that the employer intended to discriminate on the basis of age in reaching that decision. <u>See</u> <u>Zaben v. Air Products & Chemicals, Inc.</u>, 129 F.3d 1453, 1457 (11th Cir. 1997) (citing <u>Jameson v. Arrow Co.</u>, 75 F.3d 1528, 1532 (11th Cir. 1996)).[9]   Once the plaintiff presents a prima facie case of discrimination, the burden shifts to the defendant to present evidence that there are legitimate, non-discriminatory reasons for the employment action. The burden once again shifts back to the plaintiff

---

[9]Both the plaintiff and the defendant cite to <u>Wilson v. AAA Plumbing Pottery Corp.</u>, 34 F.3d 1024 (11th Cir. 1994) in reference to the reduction in workforce claim. The <u>Wilson</u> opinion, however, was VACATED in <u>Wilson v. AAA Plumbing Pottery Corp.</u>, 60 F.3d 744 (11th Cir. 1995).

6

to offer evidence that the reasons alleged by the defendant are pretexts for discrimination. <u>See</u> <u>McDonnell Douglas Corp. v. Green,</u> 411 U.S. 792 (1973).

In the present case, the plaintiff has no direct evidence of intentional discrimination. Instead, he relies on circumstantial evidence in an attempt to prove his prima facie case. Even assuming that the plaintiff meets his prima facie case of discrimination, the defendant has presented a legitimate, non-discriminatory reason for the employment action. Indeed, both the plaintiff and another white employee (with the same job title) lost their jobs as a result of a reduction in workforce. The plaintiff had access to other job openings on the computer job posting system and was even told of other positions by his immediate supervisor. The plaintiff has not presented sufficient evidence to allow a jury to reasonably conclude that the defendant's reasons were pretextual. Summary judgment is due to be GRANTED in favor of the defendant on the discharge claim.

## II. Retaliation

In order to prove a claim of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression, (2) he suffered an adverse employment action simultaneously with or subsequent to such protected expression, and (3) there was a casual link between the protected expression and the adverse employment action. <u>See</u> 42 U.S.C. § 2000e-3(a); <u>Tipton v. Canadian</u> <u>Imperial Bank of Commerce,</u> 872 F.2d 1491, 1494 (11th Cir. 1989). The plaintiff here asserts that his statement to Velda Krancer, the HR Administrator, about his concern for the lack of blacks in management positions at GTE meets the definition of protected activity under Title VII. Additionally, the plaintiff suffered an adverse employment action that would satisfy the second element of his claim. However, even assuming that the plaintiff has satisfied the first and second

7

elements of the retaliation charge, he has provided no evidence that would allow a reasonable jury to find that there was a causal link between the protected activity and the adverse employment action. The defendant's motion for summary judgment is therefore due to be GRANTED.

## III. Failure to Promote

In order to succeed in a failure to promote claim, the parties must follow the now familiar rubric of the McDonnell Douglas burden-shifting test. That test requires the plaintiff to first prove a prima facie case of intentional discrimination by showing that: (1) the plaintiff was a member of a protected class, (2) he was qualified for and applied for the promotion, (3) he was rejected despite these qualifications, and (4) someone outside the protected class was hired for the position. See Walker v. Mortham, No. 95-2898, 1998 WL 751043, at *12 (11th Cir. Oct. 28, 1998) (clarifying that the plaintiff need not show that he is equally or more qualified that the person hired during the prima facie case). Assuming that the plaintiff in this case has meet his burden of proving his prima facie case of discrimination, there are genuine issues of material fact regarding the defendant's alleged legitimate and non-discriminatory reasons which preclude the court from granting summary judgment in favor of the defendant. Because such genuine issues of material fact exist, the motion for summary judgment is due to be DENIED.

## Conclusion

No genuine issues of material fact exist with regard to the discharge or retaliation claims in this case. However, while summary judgment is due to be granted as to the discharge and retaliation claims, there are genuine issues of material fact in the failure to promote claim which should be

8

decided by a jury. This case will proceed to trial on the claim for discriminatory failure to promote only.

Dated: _____ _Nov_ , _10_ _____, 1998.

_____

Chief Judge Sam C. Pointer, Jr.

Service List:
    Leslie M Proll
    Abigail P. van Alstyne
    Chris Mitchell
    Lisa Narrell-Mead

9